UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
     v.                            )     CR. No. 09-041 S
                                   )
ANTHONY M. ST. LAURENT, Sr.        )
     aka "The Saint"               )
                                   )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge

Defendant Anthony M. St. Laurent, Sr. is charged with soliciting murder-for-hire. He moves to dismiss the indictment, claiming it is barred by a plea agreement he entered with the United States (the "government") in a prior case. The earlier charge arose in 2006, after the FBI made audio recordings of Defendant planning an extortion plot. During one of the recorded conversations, Defendant also offered to pay his cohorts to murder a long-time rival named Robert Deluca. Because that offer did not involve interstate travel or communication, the government decided it was not chargeable as a federal crime, and it did not pursue the matter. Defendant was indicted only for conspiracy to commit extortion. He pleaded guilty, and, in exchange for his plea, received a promise of immunity for crimes related to the extortion known to the government at the time.

What the government did not learn until 2007, and what it alleges in the current indictment, was that Defendant offered to

pay someone else to kill Deluca. Because that person allegedly crossed state lines to meet Defendant, this previously undiscovered offer would be a federal crime if proven. Defendant argues the current solicitation charge is off-limits, because his 2006 plea agreement forbids prosecution for any offenses related to Deluca. The Court held a hearing on his motion on September 28, 2009. Because Defendant's claim clashes with both the terms of the agreement and evidence about the parties' plea negotiations, his motion must be denied.

## BACKGROUND

Defendant is allegedly a long-time "made" or formally-initiated member of the New England mafia, also known as La Cosa Nostra ("LCN"). The events that led to his prior conviction began in the spring of 2006. At that time, he became the subject of an extortion investigation by the FBI. A government informant named Anthony Nardolillo made audio recordings of his conversations with Defendant, an individual named Ricky Silva, another person named Larry Crites, and several others. On the recordings, Defendant made incriminating statements about an extortion plot targeting two individuals in Massachusetts who purportedly owed him money. In addition, at one meeting between Defendant, Nardolillo, and Silva on April 8, Defendant raised the subject of Robert DeLuca, a supposed LCN rival of Defendant. Defendant offered to pay

Nardolillo and Silva to kill Deluca. (See Evidentiary Hr'g Tr. ("T.") 60:3-8, 65:18-67:10, Sept. 28, 2009.)

The FBI informed Assistant United States Attorney James Leavey of Defendant's comments about Deluca. Based on the information he had been provided, Leavey opined that Defendant's offer to pay for Deluca's murder was not chargeable as a violation of federal law. (See id. at 68:12-18, 109:5-110:23.) According to Leavey, the government would have "needed an interstate telephone call in order [to establish] federal jurisdiction." (Id. 110:19-21.) There was no recording of Defendant making any interstate call about Deluca. For that reason, Leavey decided to seek an indictment of Defendant only for conspiracy to commit extortion, and not for soliciting Deluca's murder. (See id. 111:2-21.)

The conspiracy indictment issued on April 12, 2006.[1] Defendant retained Judith Crowell, Esq., to defend him, and asked her to negotiate a plea agreement. He told Crowell he hoped to avoid prosecution for soliciting Deluca's homicide. Defendant, however, did not reveal to Crowell exactly whom he had asked to kill Deluca, or when he had done so. (Id. 16:4-8.) Crowell contacted Leavey. According to Crowell, Leavey told her that "the

---

[1] At the detention hearing on April 13, 2006, the government argued that Defendant posed a risk to public safety, citing his remarks about having Deluca killed. (See Evidentiary Hr'g Tr. ("T.") 112:1-8, Sept. 28, 2009.) Defendant was remanded to federal custody.

3

Federal Government was not interested in charging [Defendant] with solicitation" to commit murder-for-hire. (Id. 16:12-17.)

John Cicilline, Esq., took over as Defendant's lawyer in May 2006. Defendant reiterated to Cicilline that he did not want to be prosecuted for soliciting Deluca's murder, but again did not provide details about his efforts to do so. Cicilline learned from other individuals, whom he referred to as "street sources," that on an unknown date, Deluca had spotted Defendant outside the Sidebar and Grille (the "Sidebar"), a bar in Providence where Deluca worked. However, when Cicilline later reached out to Leavey, he did not share this information. (See id. 26:11-24, 27:20-28:4, 40:10-41:6.)

There is some disagreement about the content of the ensuing plea discussions. According to Cicilline, Leavey bargained away the right to charge Defendant with solicitation in exchange for the guilty plea:

> Q. Did Mr. Leavey come to an agreement with you about the solicitation charge?
> A. He sent me a plea agreement. I don't know whether he called me before he sent it to me, but he sent me a plea agreement, so, yes, we came to an agreement.
> Q. And what was that agreement? What did you understand that agreement to be?
> A. I understood the agreement [to be] that [Defendant] would plead to the extortion and that, as part of the agreement, he would not be prosecuted for the plot to kill DeLuca.

(Id. 28:11-21.) Leavey, on the other hand, remembers that the conversation about Deluca was collateral to the plea negotiations:

4

> [Cicilline] asked me if I was going to prosecute the plot to kill Bobby DeLuca. And I said I was not. I said it was not dependent upon whether he pleads or goes to trial. We are not prosecuting. I said, however, the state may prosecute.

(Id. 114:10-14.) In other words, Leavey did not give up the right to bring a solicitation charge; rather, he had already decided against bringing that charge.

Leavey drafted a plea agreement for Defendant, which the parties executed in June 2006. Paragraph 2 provides:

> The government agrees not to charge the defendant with any offenses known to the government related to the conspiracy charge to which defendant is pleading, so long as defendant does not attempt to withdraw his plea of guilty to [the April 12, 2006] indictment.

(Plea Agreement, CR. No. 06-048S, June 21, 2006 ("Plea") ¶ 2(e).) In paragraph 13, the agreement states that Defendant "is aware . . . he may be charged by the State of Rhode Island for an alleged solicitation for murder." (Id. ¶ 13.) Finally, paragraph 14 contains an "integration clause," declaring that the written agreement constitutes the entire agreement between the parties. The Court accepted Defendant's plea at a hearing held on July 12, 2006. At the hearing, no one mentioned Deluca or murder-for-hire charges.

The facts underlying the current charge came to light in January, 2007. It was then that the FBI apprehended Crites in Massachusetts and charged him as a participant in the April 2006 extortion conspiracy. Crites recounted a meeting with Defendant

5

that took place on April 12, 2006 — the same day Defendant was indicted on the conspiracy charge. That day, Crites traveled from Massachusetts to Johnston, Rhode Island, where he met Defendant. From there, the two drove in Defendant's car to the Sidebar. (See T. 71:3-21.) During this trip, Defendant allegedly offered to pay Crites to kill Deluca. (See id. 71:22-72:3.)

The current indictment charges Defendant with soliciting murder-for-hire on April 12, 2006. On August 12, 2009, Defendant filed the instant motion to dismiss the indictment on grounds that it is forbidden by his 2006 plea agreement.

## DISCUSSION

Despite any possible appearance to the contrary created by the timing of the underlying facts, the plea agreement does not cover the solicitation charge. It therefore poses no obstacle to the current prosecution.

### I. Legal Standard

Courts treat plea agreements "more or less as contracts" that bind the prosecution and the defense. United States v. Ortiz-Santiago, 211 F.3d 146, 151 (1st Cir. 2000). "Consequently, defendants ordinarily should be held to plea-agreement terms that they knowingly and voluntarily accept." United States v. Teeter, 257 F.3d 14, 28 (1st Cir. 2001). However, the contract analogy "has its limitations." United States v. Alegria, 192 F.3d 179, 183 (1st Cir. 1999). "If a plea agreement unambiguously resolves an

6

issue, that usually ends the judicial inquiry. If, however, a plea agreement lacks clarity or is manifestly incomplete, the need to disambiguate may justify resort to supplementary evidence or other interpretive aids." Id. (internal citations omitted).

Particularly where the defendant waives a significant right, such as the right to appeal, ambiguities in a plea agreement "are construed against the government." United States v. Newbert, 504 F.3d 180, 185 (1st Cir. 2007). But this principle only gives effect to the "objectively reasonable understanding[s]" of a defendant in the event of ambiguity. United States v. Conway, 81 F.3d 15, 17 (1st Cir. 1996); see United States v. Giorgi, 840 F.2d 1022, 1028-29 (1st Cir. 1988) (looking to the reasonable expectations of parties to interpret an ambiguous term in a plea agreement). It also does not mean that courts should read plea agreements to "imply unspoken promises," especially where they contain integration clauses explicitly limiting the understanding between the parties to the written terms of the document. See United States v. Anderson, 921 F.2d 335, 338 (1st Cir. 1990). In that case, the agreement should be enforced "according to its tenor." United States v. De-La-Cruz Castro, 299 F.3d 5, 14 (1st Cir. 2002) (quotation marks and citation omitted).

## II. Scope of the Plea Agreement

A. Offenses "related to the conspiracy charge"

Analysis of a plea agreement begins with "the language of the document." Anderson, 921 F.2d at 337-38. By its terms, Defendant's 2006 plea agreement does not bar the current charge. Specifically, according to paragraph 2, the government gave up the right to charge Defendant with offenses "related to the conspiracy charge." (Plea ¶ 2(e).) The charge contained in the indictment — that Defendant allegedly solicited Crites to kill Deluca on April 12, 2006 — was not "related to" the extortion conspiracy. The alleged facts supporting the charge, including the meeting with Crites, the drive to Deluca's workplace, and the offer of money in exchange for murdering Deluca, did not further the extortion efforts. And Deluca was not a victim of the extortion scheme.

Moreover, soliciting murder-for-hire is punishable under a different statute, 18 U.S.C. § 1958, than the statute that governs extortion conspiracies, 18 U.S.C. § 894. Thus, the solicitation and conspiracy charges involved different conduct, had different objectives, targeted different victims, and would constitute different crimes (if the government proves the current allegations). Accordingly, in the Court's view, the ordinary meaning of the phrase "related to the conspiracy charge" unambiguously excludes the solicitation charge.

8

Defendant nevertheless contends that the alleged solicitation was factually "related to" the extortion conspiracy. He points out that his attempts to pay for Deluca's murder were contemporaneous with the extortion scheme. He also promoted the Deluca offer to several members of the conspiracy, in which Crites himself took part. However, even assuming the words "related to" create some ambiguity about the scope of immunity, it does not extend to the current prosecution. The question becomes whether "the interpretation issue can <u>reasonably</u> be resolved against the government." <u>Newbert</u>, 504 F.3d at 188 (Boudin, C.J. concurring) (emphasis added). Here, it cannot.

The First Circuit's analysis in <u>Giorgi</u> illustrates why. In that case, the First Circuit concluded that "the phrase 'any criminal acts <u>related</u> <u>to</u> thefts or hijackings of vans'" in a plea agreement was ambiguous. <u>Giorgi</u>, 840 F.2d at 1028 (emphasis in original). The words could "conceivably extend" to later charges of arson, because the fires at issue consumed a warehouse containing merchandise stolen from hijacked vans. <u>Id.</u> Nevertheless, the theft "was not central to the [later] scheme," which "focused on arson and insurance fraud." <u>Id.</u> Therefore, "no party to the plea bargain could reasonably expect the . . . agreement to [affect the defendant's] exposure on charges of arson and mail fraud," and the agreement did not bar prosecution for those offenses. <u>Id.</u> at 1029.

9

The same logic applies here. The extortion plot was not "central" to the alleged solicitation. Defendant happened to be involved in the extortion scheme when he began shopping around the Deluca proposal. The two acts "focused" on different ends: the goal of the conspiracy was to collect money by threatening two people in Massachusetts, whereas the goal of the alleged solicitation was to pay others to dispatch Deluca. As a result, Defendant could not "reasonably expect" that the plea agreement granted him immunity from the solicitation charge. See Giorgi, 840 F.2d at 1029; United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1401 (4th Cir. 1993) (finding that even if the phrase "same or similar character [to offenses] cited herein" was ambiguous, the defendant's interpretation was unreasonable, and could not be accepted); see also United States v. Cvijanovich, 556 F.3d 857, 862 (8th Cir. 2009) (finding that an agreement covering "any conduct concerning" certain crimes did not extend to offenses of the same type committed at a different place and later time). This is sufficient to exclude the solicitation charge from the plea agreement.

B. Offenses "known to the government"

Even if the meeting with Crites were "related" to the conspiracy charge, Defendant's motion would still fail. The plea agreement poses a second barrier to the immunity he seeks. It only applies to offenses "known to the government" at the time, and the

government did not discover the alleged solicitation involving Crites until 2007.

Evidence presented to the Court revealed no way the government could have learned of Defendant's alleged meeting with Crites any earlier. Crites was not debriefed until his arrest in 2007. Nardolillo, the informant, was not privy to the alleged conversation with Crites, and did not record it.[2] Plus, Defendant himself did not confess to either of his lawyers that he solicited Crites. And even assuming the visit to the Sidebar that Cicilline's "street sources" described was the one he allegedly took with Crites on April 12, and not some other trip, Cicilline did not pass that information along to Leavey. (See id. 40:10-16.)

Defendant attempts to evade the "known to the government" clause by lumping his various inquiries about murder for hire into a single "plot" to kill DeLuca. The government, of course, knew about Defendant's comments to Nardolillo and Silva regarding Deluca from the April 8 recording. Therefore, Defendant contends, the "Deluca plot" was "known to the government," regardless of whether the government specifically knew of an April 12, 2006 solicitation of Crites.

---

[2] Silva and Crites also apparently discussed Defendant's solicitation of Crites shortly after Defendant was arrested. (See id. 99:13-100:4.) But, like Crites, Silva was first arrested in January 2007. (See id. 86:5-10.) Before then, he could not have told the government what Crites shared with him.

This argument distorts the current indictment, which only charges Defendant with soliciting murder-for-hire. It does not allege any conspiracy to kill Deluca. To prove a conspiracy, the government would have to show that one of the people Defendant asked to murder Deluca agreed to the request. There is no indication the government could carry that burden even if it chose to. The government has no evidence that Crites, Nardolillo, or Silva either agreed to participate in killing Deluca or colluded with regard to carrying out Defendant's request. (See T. 72:4-10, 100:5-10.) Defendant's alleged solicitation of Crites, and not any agreement, is the sole basis for the current charge. The government's ignorance of that specific offer excludes it from the plea agreement.[3]

---

[3] Defendant also argues that the government should have figured out that he solicited Crites to kill Deluca. Even if this were true, it would not establish that the alleged solicitation was "known to the government." See United States v. Sutton, 794 F.2d 1415, 1423 (9th Cir. 1986) ("The words 'conduct known to the government' cannot fairly be construed as 'conduct that reasonably could have been known.'"). That aside, Defendant exaggerates what the government could have deduced. He argues the trip to the Sidebar with Crites actually took place before April 6, and seizes on several of his comments on the recordings made by Nardolillo. For instance, at the April 6 and 8 meetings, Defendant mentioned previously meeting with Crites. On April 8, he also revealed that Deluca had spotted him lurking outside the Sidebar. (See Trs. of Apr. 6, 2006 Audio Recording, and Apr. 8, 2006 Audio Recording.) However, Defendant did not so much as hint at taking anyone along to the Sidebar, let alone announce that he offered Crites money to kill Deluca. Furthermore, although Crites is audible on one of Nardolillo's recordings from April 6, he did not refer to visiting the Sidebar with Defendant. (See Tr. of Apr. 6, 2006 Audio Recording.) The facts Defendant cites thus do not support the inferential leap that he asked Crites to murder Deluca.

C. Reference to state murder-for-hire charges

Paragraph 13 of the agreement announces that Defendant "is aware . . . he may be charged by the State of Rhode Island for an alleged solicitation for murder." (Plea ¶ 13.) Defendant paints paragraph 13 as an acknowledgment that the government agreed not to bring federal solicitation charges. However, "significant plea-agreement terms should be stated explicitly and unambiguously." United States v. Burns, 160 F.3d 82, 83 (1st Cir. 1998); accord Alegria, 192 F.3d at 185. Foregoing prosecution for solicitation of Deluca's murder would be a significant term. It cannot rest on the unstated implication Defendant foists on Paragraph 13. Rather, the plain meaning of paragraph 13 is only that the government could not release Defendant from state criminal liability for soliciting murder. It does not support Defendant's interpretation.

### III. Alleged Oral Promises

Plaintiff insists the government verbally assured him he had a deal about the Deluca matter. However, he is not entitled to look beyond the written plea agreement to support his motion. Paragraph 14 provides as follows:

> This agreement constitutes the entire agreement between the parties. No other promises or inducements have been made concerning the plea in this case. Defendant acknowledges that no person has, directly or indirectly, threatened or coerced Defendant to enter this agreement. Any additions, deletions, or modifications to this agreement must be made in writing and signed by all the parties in order to be effective.

13

(Plea ¶ 14.) "Absent special circumstances, a defendant — quite as much as the government — is bound by a plea agreement that recites that it is a complete statement of the parties' commitments." United States v. Connolly, 51 F.3d 1, 3 (1st Cir. 1995). Moreover, at the plea hearing, Defendant reaffirmed "in open court that no unwritten promises were part of the plea bargain." Id. at 3. After the government summarized the terms of the agreement, Defendant indicated that it had characterized the plea bargain accurately. No one mentioned Deluca or murder-for-hire charges.[4] (See Hr'g Tr., CR No. 06-48 S, 8, 10-11, July 12, 2006.)

Together, the integration clause and the plea hearing authorize the Court to "construe the written document within its four corners," and disregard alleged extra-textual promises. Alegria, 192 F.3d at 185; see Connolly, 51 F.3d at 3 (declining to consider alleged oral promise in light of integration clause in defendant's plea agreement and statements at the plea hearing).

In any event, there is no evidence that Defendant received any oral promise at variance with the written agreement. The credible

---

[4] The fact that neither Defendant nor his lawyer "communicate[d] his interpretation of the agreement at the time of the . . . plea hearing" is another reason that the Court cannot accept his argument. United States v. Giorgi, 840 F.2d 1022, 1029 (1st Cir. 1988). He made no "clear and contemporaneous manifestations of his understanding" of the agreement. Id. (citing United States v. Harvey, 791 F.2d 294, 302-03 (4th Cir. 1986) as an example of a decision properly validating a defendant's understanding of an agreement that conflicts with that of the government).

14

testimony at the hearing showed that prosecuting murder-for-hire was never on the table during plea negotiations. Because it was not a bargaining chip that the government relinquished, it could not have formed the basis for an oral promise.

Leavey testified, entirely credibly, that he decided not to charge Defendant with solicitation before plea negotiations even began. He did not know about the meeting with Crites. Based on what Leavey did know, he did not believe the government could establish federal jurisdiction without a taped interstate phone call, which he did not have. For that reason, when Cicilline asked if Leavey was going to prosecute the Deluca matter, Leavey "said [he] was not." (T. 114:11-12.) "I said it was not dependent upon whether he pleads or goes to trial. We are not prosecuting." (Id. 114:12-13)

Cicilline's testimony raised no material doubt that this is what Leavey actually said. Cicilline broadly asserted that the government "agreed not to prosecute [Defendant] for the plot to kill Robert Deluca." (Id. at 46:22-25.) Yet, to support that claim, Cicilline referred not to his communications with Leavey, but to the plea agreement itself:

> Q. Did Mr. Leavey come to an agreement with you about the solicitation charge?
> A. He sent me a plea agreement. I don't know whether he called me before he sent it to me, but he sent me a plea agreement, so, yes, we came to an agreement.

15

(Id. 28:11-15.) Thus, although Cicilline believed that the plea agreement addressed his concerns — which it did not, for the reasons explained above — he did not contradict Leavey's version of the discussion.

Crowell further bolstered Leavey's credibility. Crowell did not state that Leavey agreed to forego a solicitation charge in exchange for Defendant's guilty plea. Rather, according to Crowell, Leavey said that "the Federal Government was not interested in charging [Defendant] with solicitation." (Id. at 16:15-17.)

In the Court's view, the evidence shows Leavey's story to be the most likely version of events: Leavey explained there would be no prosecution for Defendant's remarks about Deluca, not because of Defendant's plea, but because the government was "not interested" based on what it knew at the time. The Court therefore finds that Leavey did not vow to forego future charges related to Deluca, orally or otherwise.

## CONCLUSION

Defendant's interpretation of the plea bargain finds no support in the text of the agreement, his statements at the plea hearing, or the evidence of the parties' negotiations. Thus, "[a]ny mistaken belief held" by Defendant that his agreement covered the Deluca matter "was purely subjective and poses no bar to the instant prosecution." Giorgi, 840 F.2d at 1029; see United

States v. Oliverio, 706 F.2d 185, 187 (6th Cir. 1983) ("[The defendant] cannot now rely on his mistaken subjective impression of the effect of his earlier guilty plea as a bar to prosecution on totally unrelated charges."). For this reason, Defendant's motion is DENIED.

IT IS SO ORDERED.

_/s/ William E. Smith_

William E. Smith
United States District Judge
Date: 11/10/09